NOS. 21-36024 & 21-36025

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UGOCHUKWO GOODLUCK NWAUZOR, FERNANDO AGUIRRE-URBINA,
individually and on behalf of those similarly situated,
*Plaintiffs-Appellees*,

and

STATE OF WASHINGTON,
*Plaintiff-Appellee*,

v.

THE GEO GROUP, INC.,
*Defendant-Appellant*.

Appeal from the United States District Court
for the Western District of Washington
Civil Case Nos. 3:17-cv-05769 & 3:17-cv-05806
(Honorable Robert J. Bryan)

## PETITION FOR PANEL REHEARING OR REHEARING EN BANC

February 6, 2025

Charles J. Cooper
Michael W. Kirk
J. Joel Alicea
Joseph O. Masterman
COOPER & KIRK, PLLC
1523 New Hampshire Avenue, NW
Washington, DC 20036
(202) 220-9600
ccooper@cooperkirk.com
mkirk@cooperkirk.com

*Attorneys for Defendant-Appellant The GEO Group, Inc.*

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...................................................................... ii

INTRODUCTION ................................................................................. 1

ARGUMENT ....................................................................................... 6

I.  The WMWA Violates Intergovernmental Immunity. ...................................... 6

II.  The WMWA Is Preempted. ................................................................ 11

III.  GEO Is Entitled to Derivative Sovereign Immunity. .................................. 15

CONCLUSION .................................................................................. 18

i

# TABLE OF AUTHORITIES

**Cases**                                                                                 **Page(s)**

*Alvarado Guevara v. INS*,
   902 F.2d 394 (5th Cir. 1990) ........................................................................13

*Boeing Co. v. Movassaghi*,
   768 F.3d 832 (9th Cir. 2014) ....................................................................2, 10

*Buckman Co. v. Plaintiffs' Legal Comm.*,
   531 U.S. 341 (2001)................................................................................ 13, 14

*Cabalce v. Thomas E. Blanchard & Associates*,
   797 F.3d 720 (9th Cir. 2015) ..................................................................5, 17

*Campbell-Ewald Co. v. Gomez*,
   577 U.S. 153 (2016)........................................................................ 6, 15, 16

*Dawson v. Steager*,
   586 U.S. 171 (2019)....................................................................................9

*Demore v. Kim*,
   538 U.S. 510 (2003)..................................................................................11

*FEC v. Cruz*,
   596 U.S. 289 (2022)..................................................................................12

*Fiallo v. Bell*,
   430 U.S. 787 (1977)..................................................................................11

*Goodyear Atomic Corp. v. Miller*,
   486 U.S. 174 (1988)................................................................................2, 7

*Guevara v. INS*,
   No. 90-1476, 1992 WL 1029 (Fed. Cir. Jan. 6, 1992) .................................13

*Hancock v. Train*,
   426 U.S. 167 (1976)....................................................................................9

*In re Hanford Nuclear Reservation Litigation*,
   534 F.3d 986 (9th Cir. 2008) ......................................................................17

*Nat'l Fed'n of the Blind v. United Airlines Inc.*,
   813 F.3d 718 (9th Cir. 2016) ......................................................................15

*Nwauzor v. The Geo Grp., Inc.*,
   540 P.3d 93 (Wash. 2023) (en banc) ............................................................4

*Ry. Mail Ass'n v. Corsi*,
  326 U.S. 88 (1945)......................................................................5, 9

*S. Cal. Gas Co. v. City of Santa Ana*,
  336 F.3d 885 (9th Cir. 2003) ...............................................16

*Taylor Energy Co., LLC v. Luttrell*,
  3 F.4th 172 (5th Cir. 2021) .................................................6, 16

*The GEO Grp., Inc. v. Newsom*,
  50 F.4th 745 (9th Cir. 2022) ............................................. 1, 5, 7

*United States v. California*,
  921 F.3d 865 (9th Cir. 2019) ........................................... 7, 8, 14

*United States v. MacCollom*,
  426 U.S. 317 (1976)...............................................................12

*United States v. Washington*,
  596 U.S. 832 (2022)...............................................................2, 7

*Yearsley v. W.A. Ross Constr. Co.*,
  309 U.S. 18 (1940).................................................. 6, 15, 16, 17

## **Constitutional Provisions, Statutes & Legislative Materials**

U.S. CONST. art. VI, cl. 2 ..........................................................2

8 U.S.C.
  § 1324a(a)(1)(A)...................................................................10
  § 1324a(a)(2) .......................................................................10
  § 1555 ...................................................................................11
  § 1555(d)......................................................................... 11, 13

Department of Justice Appropriation Act, 1979, Pub. L. No. 95-431,
  92 Stat. 1021, 1027 (1978) ......................................... 11, 12, 13, 16

H.R. 4431 § 221, 117th Cong. (2021) .....................................13

WASH. REV. CODE § 49.46.010(3)(k).......................................2

**INTRODUCTION**

A divided panel of this Court has held that the State of Washington may mandate that federal immigration detainees receive higher wages for voluntary work performed at a federal detention facility than the State pays its own detainees for similar work performed at a state facility simply because the federal immigration facility is operated by a federal contractor. The panel majority is alone in that opinion, which directly conflicts with prior decisions of the U.S. Supreme Court, this Court, and other Circuits.

This case involves the Northwest Immigration and Customs Enforcement Processing Center ("NWIPC"), the only facility in Washington used by the U.S. Bureau of Immigration and Customs Enforcement ("ICE") to house federal immigration detainees. *See* 1-ER-68. ICE does not provide secure residential-care services at its own detention facilities. *See The GEO Grp., Inc. v. Newsom*, 50 F.4th 745, 751 (9th Cir. 2022) (en banc). Accordingly, The GEO Group ("GEO") has provided such services at the NWIPC under contract with ICE since October 2005. *See* 1-ER-68. GEO's contract with ICE requires GEO to provide a Voluntary Work Program ("VWP") for NWIPC detainees, *see* 1-ER-69, and to pay VWP participants $1.00 per day, *see* 3-ER-504–05, 3-ER-518.

Washington seeks to force GEO to pay federal VWP participants the State minimum wage set forth in the Washington Minimum Wage Act ("WMWA"). This

1

wage far exceeds what ICE requires or what federal law allows. *See* Panel Op. at 37 (Bennett, J., dissenting) (Washington's current minimum wage "is $16.28 per hour"). And it far exceeds what the State itself is required to pay detainees for similar work: the WMWA exempts from minimum wage "[a]ny resident, inmate, or patient of a state, county, or municipal correctional, detention, treatment or rehabilitative institution[.]" WASH. REV. CODE § 49.46.010(3)(k).

This case revolves around a single question: Who has the authority to establish the rate of pay for a federal detainee who volunteers to participate in a federally established work program at a federal immigration detention facility? The Supremacy Clause, U.S. CONST. art. VI, cl. 2, provides a clear and unambiguous answer—the Federal Government.

Under the doctrine of intergovernmental immunity, states may not "directly regulate or discriminate against" the Federal Government. *United States v. Washington*, 596 U.S. 832, 835 (2022). The Supreme Court and this Court have long recognized that federal contractors also enjoy intergovernmental immunity. *See, e.g.*, *Goodyear Atomic Corp. v. Miller*, 486 U.S. 174, 181 (1988); *Boeing Co. v. Movassaghi*, 768 F.3d 832, 842 (9th Cir. 2014).

As Judge Bennett explained in his panel dissent, this simple principle makes this a simple case: "if the NWIPC were run by Washington, the facility would *not* be forced to pay detainees the minimum wage," because the WMWA exempts State

detention facilities. Panel Op. at 41 (Bennett, J., dissenting). "But because NWIPC is run by a federal contractor, the facility must pay that minimum wage." *Id*. Applying the WMWA to the VWP thus "punishes the federal government for its policy choice to use private contractors and treats the federal government differently from state facilities. That is the very definition of a state affording itself better treatment than it affords the United States. This violates the Supremacy Clause." *Id*.

The United States—which expressed its views on this case during both prior administrations—agrees with Judge Bennett. In 2019, the United States filed a statement of interest in the District Court observing that "[t]his case presents a compelling example of a State discriminating against the Federal Government and those with whom it deals." U.S. Statement of Interest at 4, *Nwauzor v. GEO Grp., Inc.*, No. 17-cv-05769 (W.D. Wash. Aug. 20, 2019), ECF No. 185 ("U.S. SOI"). And in 2024, the United States filed an amicus brief in this Court observing that, if applied to the VWP, the WMWA would "contraven[e] intergovernmental immunity because it would make federal detainees subject to provisions that do not apply, and never have applied, to persons in state custody." Br. for the U.S. as Amicus Curiae in Supp. of Appellant at 2 (Feb. 21, 2024), ECF No. 114 ("U.S. Amicus Br.").

The District Court allowed Washington to discriminate against the Federal Government in exactly that way. And now a divided panel of this Court has, too. The majority attempted to justify its refusal to adopt the straightforward reasoning

3

advanced by Judge Bennett and the United States by pointing to the fact that the WMWA has been construed not to exempt *privately operated* State detention facilities from the minimum-wage requirement.[1] According to the majority, it follows that the WMWA does not discriminate against the Federal Government if it applies to privately operated federal detention facilities. *See* Panel Op. at 20–21. But "the NWIPC federal detention facility is the only detention facility in Washington subject to the MWA." *Id.* at 40 (Bennett, J., dissenting). And because ICE does not operate detention facilities itself, the panel's holding could subject *all* ICE facilities in the Ninth Circuit to state regulation simply because the Federal Government has chosen to use contractors. The panel thus allows Washington to inflict a regulatory penalty on the Federal Government that the State will not suffer simply because the two sovereigns have made different choices about *how* to detain people. That is exactly the kind of control over federal policy that intergovernmental immunity is supposed to prevent.

The panel majority committed three other serious constitutional errors. First, allowing Washington to regulate VWP wages further violates intergovernmental immunity because it allows the State to interfere with the performance of federal

---

[1] The panel certified this question to the Washington Supreme Court, which construed the WMWA's government-institutions exemption not to apply to privately operated State detention facilities despite the absence of any such distinction in the statute. *See Nwauzor v. The Geo Grp., Inc.*, 540 P.3d 93, 100 (Wash. 2023) (en banc).

functions. *See Ry. Mail Ass'n v. Corsi*, 326 U.S. 88, 96 (1945). Under the panel opinion, GEO must provide and implement the VWP not in accordance with the terms of its contract with the Federal Government, but by terms set *by the State*. Under the majority's ruling, GEO now cannot provide the program without violating federal law and the federal contract itself, which both prohibit GEO's employment of undocumented aliens.

Second, the panel majority misapplied preemption doctrine. Although "[f]ew areas of the law are as exclusively within the domain of the federal government as immigration," the WMWA now "'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress'" in that area. Panel Op. at 49–50 (Bennett, J., dissenting) (quoting *Newsom*, 50 F.4th at 758). As Judge Bennett and the United States both have explained, "Congress has recognized the benefits of the VWP for decades, but the majority's holding 'imperils the VWP's ongoing viability'" and "'creates dramatic distinctions in the allowances applicable to detainees based on the happenstance of the location of their detention and the operator of their detention facility.'" *Id*. at 49 (quoting U.S. Amicus Br. at 15–16) (cleaned up).

Finally, relying on *Cabalce v. Thomas E. Blanchard & Associates*, 797 F.3d 720, 732 (9th Cir. 2015), the panel majority held that GEO is not entitled to derivative sovereign immunity as a federal contractor because its contract with ICE

5

purportedly gives GEO discretion to pay VWP participants more than $1.00 per day. The majority misconstrued the contract. But even on its own terms, this part of the majority opinion creates a split with Supreme Court and other circuit caselaw, under which GEO would be entitled to derivative sovereign immunity if the contract did merely authorize (rather than direct) GEO to pay VWP participants at least $1.00 per day. *See Yearsley v. W.A. Ross Constr. Co.*, 309 U.S. 18, 20–21 (1940); *Campbell-Ewald Co. v. Gomez*, 577 U.S. 153, 166–68 (2016); *accord, e.g.*, *Taylor Energy Co., LLC v. Luttrell*, 3 F.4th 172, 176 (5th Cir. 2021).

The panel opinion thus conflicts with multiple lines of controlling precedent and creates multiple constitutional problems with far-reaching consequences for federal immigration policy, as the United States has made clear under both the Biden and Trump administrations. This case should be reheard by the panel or en banc, and the judgments below should be reversed.

## ARGUMENT

### I.    The WMWA Violates Intergovernmental Immunity.

1.    By applying the WMWA to the VWP, Washington impermissibly discriminates against the Federal Government. The panel majority noted that the WMWA "does *not* apply to residents, inmates, or patients of institutions operated by Washington State governmental entities" yet "contains *no* comparable exemption for residents, inmates or patients in federally operated institutions." Panel Op. at 19

6

(emphases added). The majority even admitted that intergovernmental immunity would apply "[i]f the federal government operated the NWIPC directly." *Id*. The majority nevertheless concluded that intergovernmental immunity does not apply because the WMWA purportedly does not "trea[t] *private* facilities operated under contract with the federal government differently from *private* facilities operated under contract with the state government." *Id*. at 20 (emphases added). The State conceded at oral argument, however, that there is no such State detention facility subject to the WMWA. *See id*. at 39–40 (Bennett, J., dissenting). The State is targeting the NWIPC.

The more fundamental problem with the majority's distinction is that it makes no difference. It is well-settled that, in this context, federal contractors stand in the shoes of the Federal Government. *See Goodyear Atomic Corp.*, 486 U.S. at 180–82; *Boeing*, 768 F.3d at 842. This principle has been applied by several members of this Court. *See Newsom*, 50 F.4th at 758 (Nguyen, Ikuta, Owens, R. Nelson, Lee, Forrest, M. Smith, Watford, JJ.); *United States v. California*, 921 F.3d 865, 882–83 (9th Cir. 2019) (M. Smith, Watford, Hurwitz, JJ.). Under this principle, a state may not treat any entity, including itself, better than it treats "the Federal Government *or those with whom it deals* (*e.g.*, contractors)." *Newsom*, 50 F.4th at 758 (quoting *Washington*, 596 U.S. at 838) (emphasis added).

7

Thus, as Judge Bennett explained, the analysis here "must compare the NWIPC to Washington state-run detention facilities." Panel Op. at 47 (Bennett, J., dissenting). This is consistent with this Court's decision in *California*, 921 F.3d at 885. And "[b]ecause all parties agree that Washington applies an exception to itself that it does not extend to the NWIPC, the [WMWA] discriminates against a federal contractor and thus violates intergovernmental immunity principles." *Id*. The United States concurs. *See* U.S. SOI at 9–16; U.S. Amicus Br. at 25–26.

In response, the majority emphasized that, "in many contexts, … there are significant differences between" federal contractors and the Federal Government. Panel Op. at 22 (quotation marks omitted). "While those differences might be relevant in other contexts," as Judge Bennett noted, "they simply do not apply here." *Id*. at 43–44 (Bennett, J., dissenting). This case is not about, *e.g.*, whether GEO shares the Federal Government's tax immunity. *See id*. at 22–23 (majority op.). This case is about detention. Only the Federal Government has authority to detain those who violate federal law. As a private entity, GEO may detain people at the NWIPC only by virtue of its contract with ICE authorizing such detention on behalf of the Federal Government. In this context, the normal rule necessarily applies, and GEO is entitled to the Federal Government's immunity from the WMWA.

The majority's efforts to align its ruling with the controlling cases accordingly fail, as Judge Bennett thoroughly explained. In particular, the majority argued that

8

interpreting *Dawson v. Steager*, 586 U.S. 171 (2019), to provide federal contractors "the same intergovernmental immunity protection enjoyed by the federal government" would be "inconsistent with" *this Court's* observation in *Newsom* that states may impose some regulations on federal contractors (*e.g.*, taxes), Panel Op. at 24. But *Dawson* did not invent or change the rule that federal contractors otherwise share intergovernmental immunity, which applies particularly where, as here, a federal contractor exercises an exclusively federal power. That rule comes from Supreme Court cases. And that rule controls.

       2.      Intergovernmental immunity also prohibits states from interfering with the performance of federal functions. *See Ry. Mail Ass'n*, 326 U.S. at 96. Applying the WMWA to the VWP violates this prohibition. As the United States noted in its 2024 amicus brief, "[t]here can be no dispute that" Washington could not dictate VWP wages "if the federal government … implemented the [VWP] directly"— indeed, "Washington has acknowledged" in this case "that it could not dictate allowances paid in that circumstance." U.S. Amicus Br. at 21. The panel majority's response was, again, that GEO operates the NWIPC, which, again, is a non sequitur. *See* Panel Op. at 14–15. States may not interfere with the Federal Government by interfering with a federal contractor's performance of federal functions. *See, e.g.*, *Hancock v. Train*, 426 U.S. 167, 174 n.23, 180 (1976) (finding interference where the direct burden of state law fell *on the contractor*, not the Federal Government);

*Boeing*, 768 F.3d at 834–35, 840 (finding interference where state law regulated a federal contractor's conduct on the contractor's *own property*). And there is no more federal function than immigration detention.

Equally irrelevant is the "long-standing line of cases holding that states may impose non-discriminatory taxes on federal contractors." Panel Op. at 16. As this Court has held, state taxation is unlike state *regulation* of contractors because "tax laws d[o] not regulate what the federal contractors ha[ve] to do or how they d[o] it pursuant to their contracts." *Boeing*, 768 F.3d at 839. Here, by contrast, the WMWA has already interfered with federal functions at the NWIPC. Due to the judgments below, and the panel's affirmance, GEO can no longer operate the VWP, because federal law and GEO's contract with ICE prohibit GEO from treating immigration detainees as employees—which is the necessary result of and basis for paying VWP participants minimum wage under the WMWA. *See* 8 U.S.C. § 1324a(a)(1)(A), (a)(2); 3-ER-504–05. Even aside from shutting down the VWP, applying the WMWA to the VWP directly regulates federal functions because the WMWA "replaces the federal … standards that [GEO] has to meet to discharge its contractual obligations to [ICE]," namely, the work-program provisions of the Performance-Based National Detention Standards (PBNDS) that are incorporated into that contract. *Boeing*, 768 F.3d at 840; *see* 3-ER-505.

The WMWA thus does more than "indirectly increas[e] costs for the Federal Government." Panel Op. at 15 (quotation marks omitted). If GEO must comply with the WMWA in operating the VWP, then GEO must operate the VWP under standards chosen by the State, not the standards explicitly incorporated in the federal contract. That direct regulation violates intergovernmental immunity, as the United States again agrees. *See* U.S. Amicus Br. at 21–25.

## II.   The WMWA Is Preempted.

"[O]ver no conceivable subject is the legislative power of Congress more complete than it is over the admission of aliens." *Fiallo v. Bell*, 430 U.S. 787, 792 (1977) (quotation marks omitted). This broad authority includes the "power to detain aliens in connection with removal," *Demore v. Kim*, 538 U.S. 510, 523 (2003) (quotation marks omitted), and to control the *payment* that immigration detainees receive for work performed at federal detention facilities. The WMWA is preempted in this case by Congress's clear purpose, as expressed in 8 U.S.C. § 1555, to permit "payment of allowances … to aliens, while held in custody under the immigration laws, for work performed" only "*at such rate as may be specified from time to time in [an] appropriation Act*," *id*. § 1555(d) (emphasis added). It is Congress, not the States, that may "specif[y]" the rate of payment for work by alien detainees as it sees fit. And when Congress last set that rate, Congress authorized payment "at a rate not

in excess of $1 per day." Department of Justice Appropriation Act, 1979 ("DJAA"), Pub. L. No. 95-431, 92 Stat. 1021, 1027 (1978).

The panel majority construed Section 1555(d) as merely making funds available to ICE. Yet Section 1555(d) is *the* source of ICE's authority to operate the VWP. "An agency … literally has no power to act … unless and until Congress authorizes it to do so by statute," *FEC v. Cruz*, 596 U.S. 289, 301 (2022) (cleaned up), and public funds cannot be spent except as authorized by Congress, *see United States v. MacCollom*, 426 U.S. 317, 321 (1976) (plurality op.). If Congress "authorize[s] expenditures where a condition is met, the clear implication is that where the condition is not met, the expenditure is not authorized." *Id*. Section 1555(d) authorizes detainee payment *only on the condition* that it be "at such rate as may be specified from time to time in [an] appropriation Act." It is irrelevant that Section 1555(d) does not *itself* specify a maximum-payment rate for detainees. And it is irrelevant whether Section 1555(d)'s drafters foresaw federal contractors (which obviously existed in 1950) operating immigration-detention facilities. *See* Panel Op. at 30–31. What matters is that Section 1555(d) specifies *who* may set the maximum-payment rate for detainees: Congress, not the States.

The majority also asserted that the DJAA does not cap the detainee payment rate at $1.00 per day. *See id*. In addition to contradicting the plain language of the statute (VWP participants to be paid "at a rate not in excess of $1 per day," 92 Stat.

12

at 1027), the majority split with the other appellate courts that have considered the issue—and held that "the amount of payment was set by congressional act" at $1.00 per day. *Alvarado Guevara v. INS*, 902 F.2d 394, 396 (5th Cir. 1990); *accord Guevara v. INS*, No. 90-1476, 1992 WL 1029, at *2 (Fed. Cir. Jan. 6, 1992) (unpublished). Unlike the majority, these other courts did not focus on the DJAA's term limitation, because it was irrelevant. Section 1555(d) states that Congress will specify the rate of detainee payment "from time to time." Congress thus need not repeat the specification on an annual basis. And Congress has considered changing the rate since 1979, *see, e.g.*, H.R. 4431 § 221, 117th Cong. (2021), but has chosen not to do so. The majority also emphasized that GEO has paid more than $1.00 per day to detainees on a handful of occasions. But contractors do not dictate federal law. And regardless of whether the Federal Government ever objected to these occasional payments, the rate of detainee payment remains Congress's prerogative.

Ultimately, therefore, the panel opinion must depend on the presumption against preemption. *See* Panel Op. at 28–29. But that presumption applies only within the historic sphere of the states' police power, which, as the Supreme Court has held, does not include "the relationship between a federal agency and the entity it regulates." *Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 347 (2001). That relationship "is inherently federal in character": it "originates from, is governed by, and terminates according to federal law." *Id*. It does not matter that *the WMWA*,

standing alone, "falls squarely within the states' historic police powers." Panel Op. at 29. The relationship between ICE and GEO, and the relationship between GEO and ICE's detainees, "originates from, is governed by, and terminates according to federal law." *Buckman*, 531 U.S. at 347. Thus, the presumption against preemption does not apply.

The majority failed to mention the Supreme Court's ruling in *Buckman*, which this Court has not previously overlooked. In *California*, this Court applied *Buckman* in finding no preemption where no "federal relationship" existed "between [the] employers and their employees." 921 F.3d at 881 & n.6. By contrast, GEO's so-called VWP "employees" *are federal detainees* whose relationship with GEO arises *exclusively* from federal law. Absent federal law, these detainees would not be in custody, the VWP would not exist, and GEO would have no relationship with ICE or the detainees. In such cases, this Court applies "a presumption *for* preemption where" a state "active[ly] frustrat[es] … the federal government's ability to discharge its operations." Panel Op. at 55 (Bennett, J., dissenting) (quoting *California*, 921 F.3d at 885). The majority did the opposite.

As Judge Bennett calculated, "if an NWIPC detainee works one hour per day, the wage set by the MWA represents an increase of more than 1500% over the rate set by Congress." *Id*. at 52. For four hours of work, "that percentage increase

14

amounts to more than *6000%*." *Id.* GEO cannot continue to operate the VWP, and

provide the recognized benefits of that program, under those conditions. Thus,

> [t]he reality of the majority's opinion is that it will force ICE to either
> operate the NWIPC itself, something ICE does not do and is contrary
> to congressional policy, contract with the state, as the state exempts its
> own facilities from the MWA, or have no immigration detention
> facilities (other than those effecting brief detentions, pending transfers
> out of state) in the State of Washington.

*Id.* at 57 (citations omitted). The panel opinion also "will result in vast discrepancies

in ICE's ability to contract with contractors throughout the country." *Id.* at 58.

Accordingly, the United States told the panel that "[a]pplication of

Washington's minimum wage laws in these circumstances is at odds with the

Program that Congress has created, which caps reimbursement at $1 per day, as well

as the federal government's control over federal immigration detention." U.S.

Amicus Br. at 14. The judgments that the panel affirmed have already caused the

VWP to cease. This is one of the clearest "obstacle[s] to the accomplishment and

execution of the full purposes and objectives of Congress" that this Court will see.

*Nat'l Fed'n of the Blind v. United Airlines Inc.*, 813 F.3d 718, 724 (9th Cir. 2016)

(quotation marks omitted).

## III. GEO Is Entitled to Derivative Sovereign Immunity.

GEO's contract with ICE authorizes and directs GEO to operate a VWP at the

NWIPC, and specifically to pay detainees at the rate that GEO paid. *See* 3-ER-516,

-518. Under *Yearsley*, 309 U.S. 18, and *Campbell-Ewald*, 577 U.S. 153, Plaintiffs'

claims are barred by derivative sovereign immunity. As the Fifth Circuit explained in *Taylor*, "[t]he appropriate inquiry is whether [the contractor] adhered to the Government's instructions as described in the contract documents." 3 F.4th at 176. GEO has done so.

Adopting Plaintiffs' arguments, the panel majority broke from this precedent. First, the majority asserted that "GEO's contract with ICE does not forbid GEO to comply with" the WMWA, Panel Op. at 34, pointing to general provisions in that contract stating that, *e.g.*, the VWP shall "comply with all applicable laws and regulations," 3-ER-505. But these provisions are *general*. Meanwhile, the provision establishing that "[d]etainees shall receive monetary compensation for work completed in accordance with *the facility's standard policy*," and that "[t]he compensation is at least *$1.00 (USD) per day*," is *specific*. 3-ER-518 (emphases added); *see* 3-ER-505. In contract interpretation, "specific terms control over general ones." *S. Cal. Gas Co. v. City of Santa Ana*, 336 F.3d 885, 886, 891 (9th Cir. 2003). The specific minimum-payment provision, not any reference to general laws, establishes the minimum payment for detainee work: at least $1.00 per day. In effect, the $1-a-day rate is the equivalent of a federal minimum rate that must be, and was, paid by GEO to VWP detainees.

Second, relying on *Cabalce*, the majority asserted, contrary to the DJAA, 92 Stat. at 1027, that the VWP wage "is not dictated by [GEO's] contract with the

government, but is rather within [GEO's] discretion," and thus that GEO "is not entitled to derivative sovereign immunity," Panel Op. at 33. Any discretion that GEO possessed was expressly authorized by the contract's minimum-payment provision. *See* 3-ER-518. That distinguishes this case from *Cabalce*, where the contractor "point[ed] to *no* contractual provisions or specifications from a federal officer relevant to" the conduct for which it sought immunity. 797 F.3d at 728 (emphasis added).

If this Court's decision in *Cabalce* withholds derivative sovereign immunity even from contractors with expressly authorized discretion, then *Cabalce* conflicts with *Yearsley* and *Campbell-Ewald*. In *Yearsley*, the Supreme Court applied derivative sovereign immunity because the conduct complained of did not "excee[d] [the contractor's] authority." 309 U.S. at 21. In *Campbell-Ewald*, the Supreme Court held that the test for derivative sovereign immunity was whether the challenged action was "authorized and directed by the Government," 577 U.S. at 167, not whether the contractor had discretion in carrying out the authorized action. To the extent *Cabalce* dictates an absolute "no discretion" rule, it either conflicts with this precedent or must be limited to circumstances not present here. *Cabalce* relied for its "no discretion" statement on *In re Hanford Nuclear Reservation Litigation*, which identified a need "to implement and protect the discretionary function exception of the Federal Tort Claims Act." 534 F.3d 986, 1000 (9th Cir. 2008). Neither *Campbell-*

*Ewald* nor *Yearsley* involved tort claims, and neither does this case. So *Cabalce* does

not apply. Instead, *Yearsley* and *Campbell-Ewald* control, and GEO cannot be held

liable under State law for paying detainees at the rate that ICE authorized.

## CONCLUSION

For the reasons above and in GEO's prior briefing, this case should be reheard

either by the panel or en banc, the judgments below should be reversed, and the

Court should remand with instructions to enter judgment for GEO.

February 6, 2024                                    Respectfully submitted,

                                                    s/ *Michael W. Kirk*
                                                    Charles J. Cooper
                                                    Michael W. Kirk
                                                    J. Joel Alicea
                                                    Joseph O. Masterman
                                                    COOPER & KIRK, PLLC
                                                    1523 New Hampshire Avenue, NW
                                                    Washington, DC 20036
                                                    (202) 220-9600
                                                    ccooper@cooperkirk.com
                                                    mkirk@cooperkirk.com

                                                    *Attorneys for Defendant-Appellant*
                                                    *The GEO Group, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on February 6, 2025. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Dated: February 6, 2025                    /s/ *Michael W. Kirk*
                                            Michael W. Kirk

                                            *Attorney for Defendant-Appellant*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 11. Certificate of Compliance for Petitions for Rehearing/Responses

*Instructions for this form:* https://www.ca9.uscourts.gov/forms/form11instructions.pdf

**9th Cir. Case Number(s)** | 21-36024 & 21-36025

I am the attorney or self-represented party.

I certify that pursuant to Circuit Rule 40-1, the attached petition for panel

rehearing/petition for rehearing en banc/response to petition is *(select one)*:

☒   Prepared in a format, typeface, and type style that complies with Fed. R. App. P.

32(a)(4)-(6) and **contains the following number of words:** | 4,182 |.
*(Petitions and responses must not exceed 4,200 words)*

**OR**

○   In compliance with Fed. R. App. P. 32(a)(4)-(6) and does not exceed 15 pages.

**Signature** | s/ Michael W. Kirk | **Date** | 2/6/2025
*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* forms@ca9.uscourts.gov

**Form   1**                                                                 *Rev. 12/01/24*