# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UGOCHUKWO GOODLUCK NWAUZOR, FERNANDO AGUIRRE-URBINA,
individually and on behalf of those similarly situated,

*Plaintiffs-Appellees,*

STATE OF WASHINGTON,

*Plaintiff-Appellee,*

v.

THE GEO GROUP, INC.,

*Defendant-Appellant.*

ON APPEAL FROM THE
UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

No. 3:17-cv-05806-RJB
The Honorable Robert J. Bryan
United States District Court Judge

## STATE OF WASHINGTON'S OPPOSITION TO
## PETITION FOR PANEL REHEARING OR REHEARING EN BANC

NICHOLAS W. BROWN
Attorney General

MARSHA CHIEN, WSBA No. 47020
 Deputy Solicitor General
LANE POLOZOLA, WSBA No. 50138
 Managing Assistant Attorney General
Washington State Attorney General's Office
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

# TABLE OF CONTENTS

I.    INTRODUCTION ............................................................................1

II.   ARGUMENT ................................................................................2

    A.  The Panel Correctly Determined that Washington's MWA Does Not Violate Intergovernmental Immunity ........................................................2

        1.   The MWA Does Not Directly Regulate the Federal Government ......2

        2.   The MWA Does Not Discriminate Against Federal Contractors ........5

    B.  The Panel Correctly Determined that Washington's MWA Is Not Preempted ...........................................................................7

        1.   The Presumption Against Preemption Applies....................................8

        2.   Washington's MWA Does Not Conflict with Any Federal Law ......11

    C.  The Panel Correctly Determined that GEO Is Not Entitled to Derivative Sovereign Immunity ...............................................................15

III.  CONCLUSION..............................................................................18

# TABLE OF AUTHORITIES

## Cases

*Alvarado Guevara v. INS*,
  No. 90-1476, 1992 WL 1029 (Fed. Cir. Jan. 6, 1992) ................................... 14

*Alvarado Guevara v. INS*,
  902 F.2d 394 (5th Cir. 1990) ......................................................................... 14

*Arizona v. United States*,
  567 U.S. 387 (2012) ......................................................................................... 8

*Buckman Co. v. Plaintiff's Legal Comm.*,
  531 U.S. 341 (2001) ....................................................................................... 10

*Cabalce v. Thomas E. Blanchard & Assocs., Inc.*,
  797 F.3d 720 (9th Cir. 2015) ......................................................................... 17

*Campbell-Ewald Co. v. Gomez*,
  577 U.S. 153 (2016) ................................................................................. 16, 17

*Dawson v. Steager*,
  586 U.S. 171 (2019) ......................................................................................... 6

*DeCanas v. Bica*,
  424 U.S. 351 (1976) ..................................................................................... 8, 9

*Fort Halifax Packing Co. v. Coyne*,
  482 U.S. 1 (1987) ............................................................................................. 8

*GEO Grp., Inc. v. Newsom*,
  50 F.4th 745 (9th Cir. 2022) ........................................................................... 1

*In re KBR Inc., Burn Pit Litig.*,
  744 F.3d 326 (4th Cir. 2014) ......................................................................... 17

*In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., and Prods. Liab. Litig.*,
  959 F.3d 1201 (9th Cir. 2020) ....................................................................... 11

*Kansas v. Garcia*,
    589 U.S. 191 (2020) ...................................................................... 11

*Knox v. Brnovich*,
    907 F.3d 1167 (9th Cir. 2018) ................................................... 8, 9

*Metro. Life Ins. Co. v. Massachusetts*,
    471 U.S. 724 (1985) ........................................................................ 8

*Murphy v. Nat'l Collegiate Athletic Ass'n*,
    584 U.S. 453 (2018) ...................................................................... 11

*Ndambi v. CoreCivic, Inc.*,
    990 F.3d 369 (4th Cir. 2021) ....................................................... 14

*North Dakota v. United States*,
    495 U.S. 423 (1990) .................................................................. 3, 10

*Nwauzor v. GEO Group., Inc.*,
    540 P.3d 93 (Wash. 2023) ............................................................. 5

*Puente Arizona v. Arpaio*,
    821 F.3d 1098 (9th Cir. 2016) ....................................................... 9

*Puerto Rico Dept. of Consumer Affs. v. Isla Petroleum Corp.*,
    485 U.S. 495 (1988) ...................................................................... 11

*Rice v. Santa Fe Elevator Corp.*,
    331 U.S. 218 (1947) ........................................................................ 8

*Ridgeway v. Walmart, Inc.*,
    946 F.3d 1066 (9th Cir. 2020) ..................................................... 12

*RUI One Corp. v. City of Berkeley*,
    371 F.3d 1137 (9th Cir. 2004) ....................................................... 8

*United States v. California*,
    921 F.3d 865 (9th Cir. 2019) ........................................... 3, 8, 9, 10

*United States v. King County*,
    122 F.4th 740 (9th Cir. 2024) ....................................................... 4

*Wyeth v. Levine*,
    555 U.S. 555 (2009) ........................................................................... 8

*Yearsley v. W.A. Ross Constr. Co.*,
    309 U.S. 18 (1940) ........................................................................... 16

Statutes

8 U.S.C. § 1324a(a)(1)(A) .................................................................... 4

8 U.S.C. § 1555 ............................................................................ 12, 13, 14

Wash. Rev. Code § 49.46.005 ................................................................ 6

Wash. Rev. Code § 49.46.010(3)(k) ........................................................ 6

Other Authorities

Department of Justice Appropriations Act, 1979,
    Pub. L. No. 95-431, 92 Stat. 1021 (1978) ...................................... 13

# I.   INTRODUCTION

An en banc panel of this Court has already heard and rejected GEO's central argument here, explaining that: "Private contractors do not stand on the same footing as the federal government, so states can impose many laws on federal contractors that they could not apply to the federal government itself." *GEO Grp., Inc. v. Newsom*, 50 F.4th 745, 750 (9th Cir. 2022) (en banc). That is because "the Supremacy Clause . . . leaves considerable room for states to enforce their generally applicable laws against federal contractors," *id.* at 755, including "generally applicable health and safety laws," *id.* at 755 n.4.

This case involves such a law—Washington's Minimum Wage Act (MWA)— and nothing in GEO's petition warrants reconsideration of the panel's decision. The panel correctly concluded that the MWA does not directly regulate the federal government under binding precedent because it does not dictate where or how the government houses immigration detainees. Meanwhile, applying the MWA to GEO does not discriminate against federal contractors because the law would apply in exactly the same way to a private company that contracted with the State or a local government. The MWA is not preempted because no federal law requires GEO to pay immigrant detainees only $1 per day for their work; indeed, GEO conceded this at trial and frequently paid detainees more. Finally, GEO is not protected by derivative sovereign immunity because the federal government never ordered it to

pay detainees only $1 per day. In sum, none of these Supremacy Clause doctrines give GEO a license to ignore Washington's wage laws when it chooses to do business in the state. The Court should deny rehearing.

## II.     ARGUMENT

### A.     The Panel Correctly Determined that Washington's MWA Does Not Violate Intergovernmental Immunity

The panel did not err in rejecting GEO's claims of intergovernmental immunity. Even in dissent, Judge Bennett did not reach the direct regulation prong. That makes sense because the MWA does not directly regulate the federal government—the record showed that the federal government played no role in GEO's work program at all. Nor does the MWA discriminate against federal contractors in light of the Washington Supreme Court's confirmation that the MWA applies equally to state contractors.

#### 1.     The MWA Does Not Directly Regulate the Federal Government

Invoking the direct regulation prong, GEO and the federal government argue that the MWA would not apply if the Tacoma facility were a federal facility. Pet. at 9; U.S. Amicus Br. at 12–13. But that is exactly the point, as the panel concluded. Op. at 15 ("The problem with the government's argument is obvious on its face: The government does not 'operate[] the detention facility.'").

The direct regulation prong of intergovernmental immunity is not violated when state law "operate[s] against suppliers, [and] not the Government."

*North Dakota v. United States*, 495 U.S. 423, 437 (1990) (plurality op.). Although GEO cites *United States v. California*, 921 F.3d 865, 882–83 (9th Cir. 2019), to equate itself with the federal government, Pet. at 7–8, any reliance on *California* is disingenuous. As GEO knows, this Court's en banc opinion in *Newsom* confirmed that "[t]he scope of a federal contractor's protection from state law under the Supremacy Clause is substantially narrower than that of a federal employee or other federal instrumentality." 50 F.4th at 755; *see also id.* at 760 n.10 ("[I]t is clear that we spoke too broadly in *United States v. California* when we said that '[f]or purposes of intergovernmental immunity, federal contractors are treated the same as the federal government itself.'") (internal citation omitted). In other words, while the MWA could not apply to a federal facility, it certainly can apply to a private business like GEO. Just as federal contractors like Microsoft and Amazon are subject to the MWA, so too is GEO.

In search of a different result, the federal government claims that "the effect" of applying the MWA to GEO's work program would be to "control" federal operations. U.S. Amicus Br. at 13. Not so. As the trial made crystal clear, GEO created and ran the work program according to its staffing needs and schedules without any input from ICE whatsoever. 1-SERWA-44:17–45:14. ICE did not demonstrate any interest in the work program for the entire 15 years it was in existence. *Id.* When detainees complained to ICE about low wages and supervisor

abuse, ICE responded: "This is a GEO issue. You have to report it to GEO." 2-SERWA-473; *see* 1-SERWA-190:15–192:7. And, as relevant here, GEO sometimes paid more than $1 a day when needed to incentivize additional work. 1-SERWA-37:13–39:23, 45:22–46:24. Such additional wages were always "on GEO's dime," not the federal government's, and GEO was able to offer more because it makes millions of dollars each year from its Tacoma facility. 1-SERWA-209:22–213:5, 249:10-15; 2-SERWA-428. Simply put, even if GEO must pay the state minimum wage, the federal government remains able to detain immigrants and to contract with private detention facilities in Washington. *Cf. United States v. King County*, 122 F.4th 740, 756 (9th Cir. 2024) (local order violated intergovernmental immunity because it effected "an outright ban" on the federal government hiring any private contractor to transport or deport immigrants).

For its part, GEO argues the MWA "interfered with federal functions" because GEO chose to shut down its work program after losing at trial. Pet. at 10. According to GEO, it had to stop the work program because it would be in violation of a federal law prohibiting the employment of unauthorized aliens. *See* 8 U.S.C. § 1324a(a)(1)(A). But that argument flies in the face of the record. The Tacoma facility held lawful permanent residents and other non-citizens with work authorization. 1-SERWA-137:24–138:10, 139:8–140:3, 141:5–142:4. GEO easily could have maintained a work program with authorized detainees *and* paid the state minimum

wage. And to be sure, paying the state minimum wage would not have replaced any "federal standard," because GEO's own contract required compliance with state labor laws. 2-SERWA-367. GEO's post-judgment decision to shut down the work program does not mean that the MWA directly regulates the federal government. The panel was correct and this Court need not rehear this appeal en banc.

### 2. The MWA Does Not Discriminate Against Federal Contractors

Nor does the MWA violate the discrimination prong of intergovernmental immunity. The Washington Supreme Court's holding that the MWA applies to both state and federal contractors on an equal basis forecloses this argument. *See Nwauzor v. GEO Group., Inc.*, 540 P.3d 93, 99–100 (Wash. 2023).

Instead of accepting the Washington Supreme Court's opinion, GEO and the federal government invite this Court to ignore it by arguing (again) that the Tacoma facility should be compared to publicly run state and local facilities. But, as the panel rightly observed: "To disregard the considered opinion of the Washington Supreme Court on a question of law of that State, when we have asked for that very opinion, is . . . contrary to the principles of federalism upon which our Constitution is based." Op. at 26–27.

Not only that, GEO and the federal government's proposed comparator is squarely wrong. *See id.* at 21 (noting the dissent's comparator "treats equally apples and oranges"). As the federal government recognizes, the question of whether a state

law discriminates against the federal government "depends on how the State has defined the favored class." *See* U.S. Amicus Br. at 16 (citing *Dawson v. Steager*, 586 U.S. 171, 177 (2019)). That question admits of an easy answer here—as the panel held based on the Washington Supreme Court's opinion, "the MWA treats equally the employees of state and federal government institutions." Op. at 22. Since Wash. Rev. Code § 49.46.010(3)(k) only exempts from the MWA operators of government-run public institutions, intergovernmental immunity principles do not require that facilities owned and operated by private contractors be exempt. That statutory, textual difference *is* the "relevant difference between . . . detention facilities operated by government entities and detention facilities operated by entities like GEO," *see* U.S. Amicus Br. at 17, and there is no basis for extending immunity beyond the MWA's exemption.[1]

GEO and the federal government nonetheless argue that the MWA is discriminatory because it somehow "target[s]" the Tacoma facility. Pet. at 7. But that too is flatly wrong. Washington's MWA is a generally applicable statute that regulates *all* private employers in the state and has done so for decades before GEO ever set foot in Washington. Wash. Rev. Code § 49.46.005. Moreover, federal

---

[1] Nor is there any "tension" with other circuits considering other state laws. *Cf.* U.S. Amicus Br. at 3, 8. Wash. Rev. Code § 49.46.010(3)(k) is unique to Washington's MWA, making the panel's ruling specific to Washington and not, as GEO argues, "*all* ICE facilities in the Ninth Circuit." *Cf.* Pet. at 4.

detainees are not the only detainees in Washington who must be paid the minimum wage, as the federal government incorrectly argues. *See* U.S. Amicus Br. at 15. State inmates completing their criminal sentences at private facilities participate in work programs and are paid "at least the minimum wage, though sometimes more." *See* Dkt. No. 89. That's apples and apples being treated alike.

Finally, the federal government hypothesizes that the state minimum wage would not apply if ICE had contracted with a state prison or county jail. U.S. Amicus Br. at 15. But, again, that is exactly the point. If state prisons were allowed to contract with ICE, Washington's MWA would not apply to government-housed detainees as the Washington Supreme Court explained. Washington's MWA applies to GEO because it is a private, for-profit business—not because the MWA singles out federal immigration activity or federal contractors. Intergovernmental immunity does not require Washington to treat private businesses with federal contracts better than all other private companies that do business in or with the state.

The panel correctly concluded that the MWA does not impermissibly discriminate against GEO. No rehearing is warranted.

## B. The Panel Correctly Determined that Washington's MWA Is Not Preempted

GEO and the federal government next accuse the panel of misapplying the preemption doctrine. But their arguments again come nowhere close to justifying rehearing. The MWA is a textbook example of an employment standard passed

pursuant to the state's historic police powers, and there is no federal law that conflicts with the MWA or whose purpose would be disrupted by its application to GEO. The panel correctly rejected GEO's preemption defense.

### 1. The Presumption Against Preemption Applies

First, the panel correctly recognized that there is a strong presumption against preemption when a state exercises its traditional police powers. *Knox v. Brnovich*, 907 F.3d 1167, 1174 (9th Cir. 2018) (citation omitted). To protect against an unwarranted trampling of a state's sovereign powers, courts "assume that 'the historic police powers of the States' are not superseded 'unless that was the clear and manifest purpose of Congress.'" *Arizona v. United States*, 567 U.S. 387, 400 (2012) (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)); *accord Wyeth v. Levine*, 555 U.S. 555, 565 (2009); *California*, 921 F.3d at 885–86.

As relevant here, the panel recognized that "the States' historic police powers include '[t]he power to regulate wages and employment conditions.'" Op. at 28 (quoting *RUI One Corp. v. City of Berkeley*, 371 F.3d 1137, 1150 (9th Cir. 2004)). That is of course correct. *See Metro. Life Ins. Co. v. Massachusetts*, 471 U.S. 724, 756 (1985) ("States possess broad authority under their police powers to regulate the employment relationship to protect workers within the State[,]" including "minimum and other wage laws[.]") (quoting *DeCanas v. Bica*, 424 U.S. 351, 356 (1976)); *Fort Halifax Packing Co. v. Coyne*, 482 U.S. 1, 21 (1987) ("[P]re-emption

should not be lightly inferred in this area, since the establishment of labor standards falls within the traditional police power of the State.").

This presumption is well-established and holds true, contrary to GEO's contentions, even if a state law "'touch[es] on' an area of significant federal presence." *Knox*, 907 F.3d at 1174 (quoting *Puente Arizona v. Arpaio*, 821 F.3d 1098, 1104 n.5 (9th Cir. 2016)). That includes state laws that touch on immigration. *See DeCanas*, 424 U.S. at 355 ("[T]he Court has never held that every state enactment which in any way deals with [noncitizens] is a regulation of immigration and thus per se preempted by this constitutional power. . . ."); *California*, 921 F.3d at 885–86 (rejecting preemption challenge to state law authorizing inspections of immigration detention facilities); *see also Puente Arizona*, 821 F.3d at 1104 (applying presumption against preemption where state identity theft laws had "effects in the area of immigration").

Notwithstanding these straightforward principles, GEO and the federal government fault the panel for failing to impose a "presumption *for* preemption" because of GEO's relationship with the federal government. Pet. at 13–15; U.S. Amicus Br. at 8–9. But the MWA doesn't govern a federal relationship. It governs the employment relationship between GEO, a private company and employer, and detainee workers, as GEO's employees. And courts do not abandon the traditional preemption analysis when there exists a federal relationship in any event. *See, e.g.,*

*North Dakota*, 495 U.S. at 432–33 (state law had "a strong presumption of validity" even though it regulated liquor supply to federal military bases). Indeed, even in the immigration context, courts still ask whether the state function is one traditionally exercised by the states. *See, e.g., California*, 921 F.3d at 885–86 (upholding state law authorizing immigration detention inspections). State wage laws are unquestionably a state function, and the analysis ends there.

GEO's citation to *Buckman Co. v. Plaintiff's Legal Committee*, 531 U.S. 341, 347 (2001), does not save its argument. GEO relies upon that case to suggest that its relationship with the federal government is "inherently federal in character." Pet. at 13–14. But, as GEO acknowledges, this Court distinguished *Buckman* in *California*, 921 F.3d at 881 n.6. Indeed, in *California*, this Court upheld (among other laws) a state law that required employers to provide employees notice when federal immigration authorities conduct workplace inspections, reasoning that the state law simply regulated the relationship between state employers and their employees— and not any relationship held by federal immigration authorities. 921 F.3d at 881.

That same analysis applies here. Washington's MWA in no way interferes with federal immigration officials' ability to determine which non-citizens to detain or where to detain them. *See id.* at 885 (no preemption of state's "inspection regime" for immigration facilities because state law "does not regulate whether or where an immigration detainee may be confined"). Instead, Washington's MWA regulates the

relationship between employers and their employees. Since Washington's MWA is a longstanding labor law that does not undermine or disrupt any area of exclusive federal control, the presumption against preemption applies.

### 2. Washington's MWA Does Not Conflict with Any Federal Law

Even putting presumptions aside, the panel was correct in holding that Washington's MWA does not conflict with any federal law or frustrate any congressional objective. Op. at 29–30. "'There is no federal preemption *in vacuo*,' without a constitutional text, federal statute, or treaty made under the authority of the United States." *Kansas v. Garcia*, 589 U.S. 191, 202 (2020) (quoting *Puerto Rico Dept. of Consumer Affs. v. Isla Petroleum Corp.*, 485 U.S. 495, 503 (1988)). Indeed, "[t]he Supremacy Clause gives priority to 'the Laws of the United States,' not the priorities and preferences of federal officers[.]" *In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., and Prods. Liab. Litig.*, 959 F.3d 1201, 1212 (9th Cir. 2020) (cleaned up).

Here, neither GEO nor the federal government point to any federal law creating or mandating a work program, much less governing the wages workers must be paid by a private company like GEO. Indeed, they point to no federal law that regulates private-detention providers like GEO *at all*, which alone is sufficient to end the preemption inquiry. *See Murphy v. Nat'l Collegiate Athletic Ass'n*, 584 U.S. 453, 479 (2018) (holding that "every form of preemption is based on a federal law

that regulates *the conduct of private actors*") (emphasis added); *see also Ridgeway v. Walmart, Inc.*, 946 F.3d 1066, 1083 (9th Cir. 2020) (rejecting preemption argument where "federal law says nothing" about the paid-break rules applicable to private employers).

Against this backdrop, GEO and the federal government turn to 8 U.S.C. § 1555 and say that the panel misinterpreted that provision. But that law simply provides that "[a]ppropriations now or hereafter provided . . . shall be available for," among other things, "payment of allowances (at such rate as may be specified from time to time in the appropriation Act involved) to aliens, while held in custody under the immigration laws, for work performed[.]" 8 U.S.C. § 1555(d). It says nothing about work programs run by private contractors, which did not exist in 1950 when Section 1555(d) was enacted. It says nothing about wages that must be paid by private contractors under state and local laws. And it says nothing about whether longstanding state employment laws are displaced.

GEO suggests those shortcomings are "irrelevant" and shouldn't matter—"what matters," it says, "is that Section 1555(d) specifies who may set the maximum-payment rate for detainees[.]" Pet. at 12. But there's a fundamental flaw in GEO's contention, which the panel and the federal government correctly recognized. Congress of course can provide appropriations that ICE can use to fund worker pay under Section 1555(d). But by its plain terms, the statute does not set a

"maximum payment" rate *for GEO*, and it does not say anything about private actors as employers or wages at all. It dictates at most how *ICE* can spend future appropriations. And the federal government agrees that federal law allows GEO to pay whatever it likes, just as GEO admitted it does at trial in this case. 1-SERWA-37:13–39:30 (GEO admitting to paying up to $5 per hour at times). As the federal government put it succinctly in an earlier amicus brief: "[C]ontractors are not prohibited from providing additional allowances . . . ." Dkt. No. 114 (U.S. Amicus Br.) at 1–2. The panel did not err in accepting this understanding of Section 1555(d).

As a second-line argument, GEO and the federal government argue that the MWA is preempted by a single appropriations act from 1978, which capped the public funds available to the INS that fiscal year for "payment of allowances" to $1 per day. But that act, like Section 1555, says nothing about what private contractors may pay, and certainly does not reference wages owed to employees. Nor does it suggest in any way that state wage laws would be preempted. Moreover, that act necessarily expired at the close of fiscal year 1979, more than forty years ago. *See* Department of Justice Appropriations Act, 1979, Pub. L. No. 95-431, 92 Stat. 1021, 1021 (1978) ("An Act making appropriations . . . for the fiscal year ending September 30, 1979").

GEO tries to overcome these fatal facts by arguing that "other appellate courts" have "held that '[t]he amount of payment was set by congressional act' at

$1.00 per day." Pet. at 12–13. They read too much into those cases, however, which addressed only whether individuals were employees under the federal Fair Labor Standards Act (FLSA); none addressed preemption of state wage claims brought against private contractors. *See Alvarado Guevara v. INS*, 902 F.2d 394, 396 (5th Cir. 1990); *Alvarado Guevara v. INS*, No. 90-1476, 1992 WL 1029, at *2 (Fed. Cir. Jan. 6, 1992) (unpublished); *see also Ndambi v. CoreCivic, Inc.*, 990 F.3d 369, 371 n.1 (4th Cir. 2021) (interpreting FLSA and identical state law).

GEO next argues that the act's limited duration is irrelevant. That is wrong. But even if the act were currently in force, as the panel correctly explained, "it would not help GEO." Op. at 30–31. The act "would not forbid GEO from paying more than $1.00 per day[.]" *Id.* And again, that was both legally correct and consistent with the longstanding practice by GEO and the federal government. GEO conceded at trial that it has the option to pay, and in fact did, pay more. 1-ER-69; 1-SERWA-37:13–39:30. And the federal government agreed both before and during this case that GEO is not prohibited by law or otherwise from paying more than $1 per day to detainee workers. 2-SERWA-464; Dkt. No. 114 at 1–2. Simply put, Section 1555 and the 45-year-old appropriations act evidence *no* intent—let alone "clear and manifest" *congressional* intent—to preempt state minimum wage laws.

Finally, GEO and the federal government say that paying more to detained workers for their labor will disrupt the work program and make it more expensive

for the federal government to contract with GEO. Pet. at 15; U.S. Amicus Br. at 8–11. But as the panel correctly recognized, speculation about future labor costs for contractors cannot possibly justify intruding upon a state's sovereignty and preempting longstanding state minimum wage laws. Op. at 32–33; *see also Ridgeway*, 946 F.3d at 1083 ("[E]ven if employers must factor [state wage and hour laws] into their decisions about the prices they set, . . . [federal law] does not preempt those laws.").

In any event, the record directly refutes any contention that applying the MWA to GEO's employment of detainees would somehow disrupt the work program. As GEO and ICE know, the work program is supposed to operate consistent with state law. *See* 2-SERWA-367, 375. In short, the only disruption to the program came from GEO's choice to suspend it rather than pay its workers minimum wage. No statute or case law supports GEO's preemption argument, and no rehearing is necessary.

## C.     The Panel Correctly Determined that GEO Is Not Entitled to Derivative Sovereign Immunity

GEO's Hail-Mary derivative sovereign immunity arguments fare no better. The United States has never endorsed this defense, *see* U.S. Amicus Br. at 1; Dkt. 114 at 1, and Judge Bennett's dissent expressly declined to reach it, *see* Op. at 60 n.14. That silence is revealing.

Derivative sovereign immunity protects a private entity that has contracted with the federal government if the government acted within its constitutional authority and specifically authorized the contractor's actions at issue. *Campbell-Ewald Co. v. Gomez*, 577 U.S. 153, 167 (2016). Derivative sovereign immunity does not apply where the federal contractor "exceeded [its] authority," *Yearsley v. W.A. Ross Construction Co.*, 309 U.S. 18, 21 (1940), or violates "the Government's explicit instructions," *Campbell-Ewald*, 577 U.S. at 166.

Here, as the panel correctly concluded, GEO failed to follow the federal government's explicit instruction to comply with state labor laws. Op. at 34–35. The contract instructs GEO to comply with the "most stringent" of any conflicting federal, state, or local standards—an unambiguous directive that speaks to the precise circumstance here. 2-SERWA-375. *See Campbell-Ewald*, 557 U.S. at 167 n.7 ("Critical [to the contractor's avoidance of liability] in *Yearsley* was . . . the contractor's performance in compliance with *all* federal directions.") (emphasis added). And were there any doubt, the "Work Program" section of the contract states: "The detainee work program shall not conflict with any other requirements of the contract and *must comply with all applicable laws and regulations.*" 2-SERWA-405 (emphasis added). By refusing to pay detainees the minimum wage, GEO both exceeded the authority conferred to it by ICE and violated the federal government's explicit instructions.

Although GEO argues those contract provisions are general, the only "specific" provision it points to merely confirms GEO had wide discretion to pay more than $1 per day. Pet. at 16. In fact, GEO conceded at trial that "GEO has the option to pay more than $1/day for work performed[.]" 1-ER-69. And the unrebutted trial evidence showed GEO paid detainees more than $1 per day when necessary to recruit workers. 1-SERWA-37:13–39:23, 45:22–46:24. Under *Cabalce v. Thomas E. Blanchard & Associates, Inc.*, 797 F.3d 720, 732 (9th Cir. 2015), a private entity whose challenged conduct is not dictated by its contract with the federal government, but is rather within the contractor's discretion, is not entitled to derivative sovereign immunity. GEO appears to disagree with *Cabalce*, but neither the Supreme Court nor this Court has overturned or distinguished that decision. *See Campbell-Ewald*, 557 U.S. at 165 (reviewing a Ninth Circuit derivative sovereign immunity decision post-*Cabalce* and nowhere suggesting *Cabalce* was wrongly decided). Indeed, other circuits consider the private contractor's "discretion" similarly important. *See, e.g., In re KBR Inc., Burn Pit Litig.*, 744 F.3d 326, 346 (4th Cir. 2014) (no derivative sovereign immunity "if [the private contractor] enjoyed some discretion in how to perform its contractually authorized responsibilities").

GEO is not derivatively immune because it was allowed—indeed, required— to pay detainees the state minimum wage under its federal contract.

### III.   CONCLUSION

The Court should deny GEO's petition for rehearing en banc.

RESPECTFULLY SUBMITTED this 17th day of April 2025.

NICHOLAS W. BROWN
Attorney General

*s/ Marsha Chien*
MARSHA CHIEN, WSBA No. 47020
   Deputy Solicitor General
LANE POLOZOLA, WSBA No. 50138
   Managing Assistant Attorney General
Washington State Attorney General's Office
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744
marsha.chien@atg.wa.gov
lane.polozola@atg.wa.gov

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** | Nos. 21-36024 & 21-36025

I am the attorney or self-represented party.

**This brief contains** | 4,141 | **words,** including | | words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

○ complies with the word limit of Cir. R. 32-1.

○ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

○ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

○ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

○ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

  ☐ it is a joint brief submitted by separately represented parties.
  ☐ a party or parties are filing a single brief in response to multiple briefs.
  ☐ a party or parties are filing a single brief in response to a longer joint brief.

◉ complies with the length limit designated by court order dated 02/25/2025.

○ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | s/ Marsha Chien | **Date** | 4/17/2025

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* forms@ca9.uscourts.gov

**Form 8**                                                          *Rev. 12/01/22*

**CERTIFICATE OF SERVICE**

I certify that on April 17, 2025, I electronically filed the foregoing document with the Clerk of the Court of the United States Court of Appeals, for the Ninth Circuit by using the appellate CM/ECF system. I further certify that all participants in this case are registered CM/ECF users and service will be accomplished by the appellate CM/ECF system.

Dated: April 17, 2025.

*s/ Marsha Chien*
MARSHA CHIEN, WSBA No. 47020
